**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

JAMIE LYN KNIGHTEN, AIS 183509,   :

     Plaintiff,               :

vs.                           :       CA 12-0717-WS-C

ERNEST STANTON, et al.,       :

     Defendants.

## REPORT AND RECOMMENDATION

This cause is before the Magistrate Judge for issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b), on the motion for summary judgment filed by defendants Ernest Stanton, Charles Daughtry, Anthony Gipson, Charles Andrews, Theresa Moore, and Tony Patterson (Doc. 13; *see also* Doc. 14 (conversion)), as thrice supplemented (Docs. 29, 36 & 42) in order to fully respond to plaintiff's complaint (Doc. 1), as amended (Doc. 19), and plaintiff's comprehensive response in opposition (Doc. 44). Upon consideration of the foregoing pleadings, the Magistrate Judge recommends that the Court **GRANT IN PART** and **DENY IN PART** the motion for summary judgment, as supplemented.[1]

## FINDINGS OF FACT

Medical records supplied in this case reflect action taken by Dr. Tesemma on December 3, 2009, requesting that Knighten be issued a new pair of boots. (*See* Doc. 36,

---

[1] Plaintiff's demand for jury trial (Doc. 45) is **NOTED**. His motion for appointment of counsel (Doc. 46) is **HELD IN ABEYANCE** pending final disposition of the defendants' motion for summary judgment. Should any portion of plaintiff's case survive the defendants' dispositive motion, the undersigned will reassess the need for appointment of counsel.

Declaration of Laura Ferrell, Medical Records Group 12, at 22.) "Due to diabetes he needs better *shoes* than the normal state issue *shoes*." (*Id.* (emphasis supplied).) Those records also reflect that on October 5, 2011, Knighten was prescribed bilateral diabetic shoes secondary to neuropathy, calluses, and swelling. (Doc. 29, Exhibit 1, at 2.) Dr. Pamela Barber's clinical notes from that day specifically reflect her intent to order diabetic shoes "per protocol[.]" (*Id.* at 4.)[2] Knighten came into possession of a pair of black diabetic shoes on October 26, 2011. (*Id.* at 3.)

---

[2]  According to Barber (*see* Doc. 36, Exhibit 1, Barber declar., at 1), per published policy of the Alabama Department of Corrections effective in August of 2011, one permissible medical profile is the provision for "[s]pecial [s]hoes" for inmates with "[v]isible ulcers or deformities of the foot or feet . . . . Patients with neuropathy will be reviewed on a case by case basis." (Doc. 36, Ferrell declar., Medical Records Group 1, at 1 & 2.)  As Barber explains it, when she prescribed diabetic shoes to Knighten on October 5, 2011, those shoes would have been "soft, low, Velcro-fastener" shoes, not military-style boots. (*See* Doc. 36, Exhibit 1, Barber declar., at 4.)

> I have never prescribed or ordered a "boot profile" for Knighten. Such an order is not within the current policy and procedure guidelines (since August 19, 2011). . . . High ankle, lace-up, military style boots are very different from the soft, low, Velcro-fastener diabetic *shoes* that are prescribed and supplied. While lace-up, high ankle military-style boots may add some protection, they could also cause damage and restrict circulation.

(*Id.* (emphasis in original).) Dr. Barber references the December 3, 2009 action by Dr. Tesemma but indicates that this "profile" was not "current" on November 16, 2011, and such profile did not "fit within the current policies and procedures (as of August 19, 2011)." (*See id.*)

There can be no question but that Knighten was given a "yellow" copy of Dr. Tesemma's December 3, 2009 order (*compare* Doc. 36, Ferrell declar., Medical Records Group 12, at 12 *with, e.g.,* Doc. 36, Exhibit 6, Declaration of Theresa Moore, at 2 ("When I got t[o] Knighten's cell, he gave the piece of paper he called a 'boot profile.' The piece of paper he showed me had been wadded up, worn out, and the pen ink noting 'boot profile' was different than the **carbon** imprint." (emphasis supplied)) and while Dr. Barber insists that such "profile" was not current in 2011, there is simply no record indicating a countermanding of Dr. Tesemma's order or other evidence that the boots were ever taken from Knighten prior to November 16, 2011, as he certainly had them in the segregation unit from the day he arrived there (Doc. 29, Exhibit 2, Declaration of Leon Hampton, at 1) to the date of the incident giving rise to this complaint.

On November 10, 2011, Knighten was placed in the segregation unit at Holman Correctional Facility. (*See* Doc. 29, Exhibit 2, Hampton declar., at 1.) Upon intake, Knighten informed Correctional Lieutenant Leon Hampton that he had a boot profile and a front cuff profile. (*Id.* at 1.) Hampton confirmed with Nurse Lisa Dixon in the Health Care Unit that Knighten's representations were correct and, therefore, allowed the plaintiff "to maintain possession of his boots"[3] and informed his staff to follow the "front-cuff profile."[4] (*Id.*)

Knighten was returning to his cell in the segregation unit from the showers on November 16, 2011, when Officer Andrews approached and asked why he was wearing boots. (Doc. 1, at 4.) Plaintiff first informed the officer that the boots were the only shoes

_____

[3] The defendants point to Administrative Regulation 433 as evidence that Knighten's boots were illegal contraband in the segregation unit. That regulation certainly provides that certain clothing will be issued and allowed, including one pair of slip-on tennis shoes and one pair of shower slides. (Doc. 42, AR 433, § V.H.3.e. & f. (Aug. 18, 2009).) However, the regulation also clearly provides that "[p]rior to placement into administration, the inmate will be thoroughly searched[]" and allowed to bring into segregation authorized items; contraband items are to be "disposed of in accordance with AR 306, *Contraband and Evidence Management*" while "[p]ermissible items for general population not allowed in administrative segregation will be inventoried and stored in accordance with AR 338, *Inmate Property*." (*Id.* at § V.G.2.a.-b.) It is undisputed that when Knighten was processed into segregation, his property was inventoried and Lt. Leon Hampton allowed him to keep his boots after confirming with the medical staff that plaintiff had a valid "boot profile." (Doc. 29, Exhibit 2, Hampton declar., at 1) Thus, at the time when it would have been most appropriate to confiscate the boots as illegal contraband they were not seized. Even more interesting, while the defendants claim that the boots were contraband when they were taken from Knighten on November 16, 2011, the information supplied this Court by plaintiff indicates that the boots were returned to him when he was released to general population (*compare* Doc. 44, at 5 *with id.,* at 20 (inmate newsletter dated November 12, 2012, advised inmates when placing shoe orders they would not be "**ALLOWED TO RECEIVE COMPOSITE TOED OR STEEL TOED BOOTS**[.]")), thereby suggesting that, at best, the boots were permissible items for general population but not allowed into segregation under normal circumstances.

[4] The document supplied by the defendants evidencing the "front-cuff" profile is dated June 7, 2010 (Doc. 36, Exhibit 2, at 85), yet was obviously still in place more than one year later when Knighten was placed in the segregation unit on November 10, 2011 (Doc. 29, Exhibit 2, Hampton declar., at 1). Moreover, a medical notation dated November 14, 2011 reflects the following: "<u>NO</u> Front Cuff Profile[.]" (Doc. 36, Ferrell declar., Medical Records Group 2, at 6.) Thus, the medical staff at Holman certainly had the wherewithal and ability to countermand a medical profile when it was no longer necessary.

he had because his shower slides had been misplaced upon his placement in segregation and upon being told by Andrews that the boots were against the rules and of the officer's "need" for the boots, Knighten told Andrews that he had a "boot" profile and invited the officer to send Sgt. Moore to his cell to look at the profile. (*Id.*; *see also* Doc. 19, at 10) It is clear that Officer Andrews informed Sergeant Theresa Moore that Knighten was wearing boots in the showers. (Doc. 36, Exhibit 6, Moore declar., at 1.) Moore went to Knighten's cell and told the inmate that boots were not allowed in segregation and allegedly offered to supply him with other appropriate footwear. (*Id.*; *see also* Doc. 13, Exhibit 3, Affidavit of Theresa Moore, at 1 ("I told inmate Knighten to surrender the boots because they were **contraband** and appropriate footwear would be provided.") (emphasis supplied).) Knighten supplied Moore with a piece of paper "he called a 'boot profile[;]'" (Doc. 36, Exhibit 6, Moore declar., at 2); Sgt. Moore looked at the profile, took it with her, and commented, "We'll see about that." (Doc. 1, at 4; *see* Doc. 19, at 10.) The correctional sergeant took the paper to the cube and spoke to Nurse Dixon who allegedly "confirmed no boot profile, only a diabetic footwear notation." (Doc. 36, Exhibit 6, Moore declar., at 2.)[5] Correctional Officers Stanton, Daughtry, Andrews and Gipson then showed up at Knighten's cell five minutes later and ordered plaintiff to "cuff up"; plaintiff's hands were cuffed behind his back. (Doc. 1, at 8; *see also* Doc. 19, at 10; Doc. 44, Declaration of Jamie Knighten, at 1; Doc. 13, Exhibit 9, at 4 (Knighten's Disciplinary Statement).) Knighten's cell door was then rolled and, as plaintiff was explaining his need for the boots and the fact he did not have any other footwear, Stanton hit plaintiff with a closed fist in the face and grabbed him by the

---

[5] This is the same nurse, of course, who informed Lieutenant Hampton some six days earlier that Knighten had a valid boot profile. (Doc. 29, Exhibit 2, Hampton declar., at 1.) This Court has heard nothing directly from Nurse Dixon in this case.

throat,[6] all the while stating he "want[ed]' them motherfuckin' boots." (*Compare* Doc. 1, at 8 *and* Doc. 19, at 10 *with* Doc. 44, Knighten declar., at 1 *and* Doc. 13, Exhibit 2, at 6.) Daughtry grabbed plaintiff's legs and Stanton "slung" him onto the bed; the officers then proceeded to remove the boots from Knighten's feet. (*See* Doc. 1, at 8; Doc. 19, at 10.) Plaintiff begged the defendants not to take the only shoes he had since he was diabetic and could get sick; however, this merely prompted Stanton to hit Knighten in the face again and comment, "'[T]hat ain't shit compared to what you fixin to get.'" (*Compare id*. *with* Doc. 44, Knighten declar., at 1) After successfully removing the boots, Stanton and Daughtry threw Knighten on the floor and began to kick and stomp him (and, later, bang his head into the sink and walls), while Officers Gipson and Andrews idly stood by and watched. (*See id*.)[7] What is clear from Knighten's version of events is

_____

[6]    (*See also* Doc. 20, Affidavit of Dereck Mitchell, at 2 ("Stanton punched Knighten in the face and grabbed him by the throat and shoved him into the cell[.]"); Affidavit of Brian Menefee, at 2 ("Stanton punched Knighten in the face and grabbed him by the throat and shoved him into the cell[.]").)

[7]    The correctional officers involved in the altercation with Knighten paint a very different picture of the events of that day. Officer Daughtry contends that Knighten refused to comply with direct orders to surrender his boots and that when he attempted to remove the boots from Knighten's feet, the plaintiff kicked him on his right wrist. (Doc. 13, Exhibit 5, Affidavit of Charles Daughtry, at 1-2.) Daughtry and Stanton deny cursing or assaulting Knighten (*compare id.* at 2 *with* Doc. 13, Exhibit 4, Affidavit of Ernest Stanton, at 1). According to Stanton, the only force he used against Knighten was that necessary to insure plaintiff's compliance with orders and, then, that force necessary to protect himself and other officers when plaintiff put up a fight. (Doc. 36, Stanton declar., at 2.) "Once he stopped fighting us, we stopped using force." (*Id*.) Officer Andrews watched the action and states that "[n]o more force was used than necessary to make Knighten comply with the orders, give up the boots, and for the officers to defend themselves and bring Knighten under control." (Doc. 36, Declaration of Charles Andrews, at 1-2.) And for his part, Officer Gipson has stated that after he heard another officer tell Knighten to "cuff up" he went to the cube to call the infirmary—"to double check . . . about the boots"—and when he returned to Knighten's cell, any struggle that had occurred was over. (Doc. 36, Exhibit 7, Declaration of Anthony Gipson, at 1-2.)

that the inmate was never the aggressor and the defendants never gave him an opportunity to remove his boots. (Doc. 44, Knighten declar., at 2.)[8]

Knighten was taken to the prison infirmary, the medical records from November 16, 2011 reflecting "[s]uperficial scratches to [the] back [and a] scratch to [the left] elbow." (Doc. 13, Exhibit 2, ADOC BODY CHART DOCUMENTATION.)[9] Knighten was escorted to the prison infirmary again on November 17, 2011 (*see* Doc. 29, Exhibit 3, Affidavit of Christopher Earl);[10] plaintiff complained of a lumbar spine injury, right ankle and foot pain, left shoulder pain, left hip pain, left ear pain, and an inability to hear out of the left ear. (Doc. 36, Ferrell declar., Medical Records Group 5, at 3.) The examining nurse noted swelling of the right lower back, right ankle, left eye and left inner ear. (*Id.*) In addition, range of motion testing of the right ankle and left shoulder produced pain. (*Id.*) A large bruise was noted on Knighten's left hip and "various" scratches were noted on the back of plaintiff's neck, face, lower right leg and low back.[11]

---

[8]     The record is unclear as to how Knighten could comply with any order to surrender his boots since his hands were handcuffed to the rear.

[9]     Officers Stanton and Daughtry were also examined. (*Id.* at 4 & 5.) Both correctional officers complained of wrist pain; a bruise to Stanton's right wrist was noted by the examining nurse and slight swelling and redness was noted to Daughtry's right wrist. (*Id.*)

[10]     (*See* Doc. 20, Affidavit of Jermaine Cole, at 2 ("[On] Nov. 17[,] 2011 I saw officers take Knighten to the infirmary at least 3 or 4 times. Knighten was [] limping very badly and his left eye was swollen and badly bru[i]sed."); Menefee aff., at 3 ("The next morning November 17th 2011 Sgt. Earl came to Knighten['s] cell and left, [and then] another officer came and got Knighten out of his cell[.] Knighten was still barefoot and limping very badly[,] the officer even asked Knighten if he needed a wheelchair. As they came by my cell I asked Knighten where they were taking him[] [and] he said to the infirmary. I saw that Knighten['s] left eye was swollen and black. I saw Knighten be taken back and forth to the infirmary a number of times that day.").) In contrast to Menefee's affidavit testimony, Officer Christopher Earl has stated that "Knighten was wearing shower slides the [] morning [of November 17, 2011] when he went to the infirmary[.]" (Doc. 36, Exhibit 8, Declaration of Christopher Earl, at 1.)

[11]     It is Dr. Barber's opinion that "[n]one of these descriptions, without more, indicate a serious medical injury or medical condition." (Doc. 36, Exhibit 1, Barber declar., at 3.)

(*Id*.)[12] The nurse ordered x-rays[13] and for Knighten to "lay in" to see the doctor. (*Id*.) When Knighten saw the doctor, however, he refused to take his "meds" for his diabetes until he saw a captain or the warden. (*Compare* Doc. 36, Ferrell declar., Medical Records Group 3, at 4 *with id.*, Medical Records Group 5, at 2[14].)

Knighten continued to complain of left ear pain and an inability to hear out of the ear on November 18 and 19, 2011 and an appointment was made by the nurse for Knighten to see Dr. Barber on November 28, 2011. (*See* Doc. 36, Ferrell declar., Medical Records Group 4, at 12-14.)[15] On November 28, 2011, Dr. Barber's physical examination of Knighten's left ear revealed erythematous of the external canal and some dried blood. (*See* Doc. 36, Ferrell declar., Medical Records Group 3, at 4.) Although Dr. Barber's clinical notes refer the reader to her "orders" for her plan of treatment (*see id*.), her orders for that day are not contained in the records filed in this Court (*see id.*,

---

[12]     Knighten was given Ultram and Toradol at about 2:00 on November 17, 2011. (Doc. 36, Ferrell declar., Medical Records Group 2, at 5.) Ultram (Tramadol), a opioid analgesic, *see* http://en.wikipedia.org/wiki/Tramadol (last visited February 12, 2014), is indicated for "the management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of their pain for an extended period of time[,]" http://www.angelpharma.com/Brand-Generic.asp?iType=3 (last visited February 10, 2014), while Toradol is indicated for the short-term management of "moderately severe acute pain that requires analgesia at the opioid level[.]" http://www.rxlist.com/toradol-drug.html (last visited February 10, 2104). "Opioids are a type of narcotic pain medication . . . used to treat moderate to severe pain that may not respond well to other pain medications." http://www.webmd.com/pain-management/guide/narcotic-pain (last visited February 12, 2014).

[13]     X-rays of the right ankle, left hip, lumbosacral spine, and left shoulder were all normal. (Doc. 36, Ferrell declar., Medical Records Group 11, at 1-2.)

[14]     These records reflect that Knighten was "wheeled into HCU doubled over [with] pain, nausea, [and] c/o dizziness." (*Id*.)

[15]     In addition, on November 19, 2011, Knighten was prescribed Motrin—800 mg.— twice a day for 7 days. (Doc. 36, Ferrell declar, Medical Records Group 2, at 5.) Motrin (Ibuprofen) is indicated for the relief of mild to moderate pain. http://www.drugs.com/pro/ibuprofen-800mg.html, at 3 (last visited February 10, 2014).

Medical Records Group 2).[16] According to Barber, however, "[n]either of these are serious medical conditions." (Doc. 36, Exhibit 1, Barber declar., at 2.)

The day after the incident, that is, on November 17, 2011, Correctional Officer Stanton charged Knighten with violating Administrative Regulation 403 for failing to obey a direct order. (Doc. 13, Exhibit 9.)

> **You, inmate Jamie Knighten (W/M 183509) did refuse to surrender a pair of boots, which were unlawfully in your possession, when ordered to do so by CO Stanton. This places you in direct violation of Rule #56, specifically Failure to Obey a Direct Order of an ADOC Official in the performance of his duty, in accordance with Administrative Regulation #403.**

(*Id*.) That day, Knighten was served with a copy of the disciplinary report which advised him that his hearing was set for December 5, 2011 at 7:59 p.m. in the segregation office. (*Id*.)[17] Knighten pled not guilty and listed as witnesses, inmates John

---

[16] So, this Court knows that some type of treatment plan was ordered by Dr. Barber in reference to plaintiff's left ear but because of a missing page (or pages) from the CMS provider's orders (*see* Doc. 36, Ferrell declar., Medical Records Group, at 4-5) there is no information regarding the exact nature of such treatment.

[17] Before Knighten's disciplinary hearing was conducted, Correctional Captain James Powers produced a use of force investigative report on November 22, 2011. (Doc. 13, Exhibit 2, at 7-8.) In reaching the conclusion that "[t]he force used was justified[,]" Captain Powers' report for the most part "tracks" Sergeant Moore's incident report, with the one exception being Powers' statement that on November 17, 2011, Knighten told him that "the boots were old officer's boots given to him. Inmate Knighten refused to give the officer's name that gave him the boots." (*Id.*; *compare id. with* Doc. 13, Exhibit 2, at 1-2 (Moore's incident report).) Knighten also provided Powers with the following "Use of Force" written statement on November 21, 2011:

> On Nov. 16th 2011, after showers around 9:40 p.m. Officers Stanton, Andrews, Daughtry and Gibson came to my cell[,] opened the tray door[,] [and] Stanton said to cuff up[.] I asked him why[,] he said because I motherfucking said so. So I turned around and put my hands out and was handcuffed. Then the[y] open[ed] the cell door and Stanton says now Bitch this is the deal you can give up those boots or else. I asked him what are you going to give me to wear I'm diabetic and don[']t even have any shower slides, plus I have a boot profile, but I've got to have something to wear. Stanton says that[']s not my fucking problem and hit me in the left side of the face[,] grabs me by the throat[,] shoves me back onto the bed on my back and holds me down by the throat and while the boots are taken off my feet then he lets me raise up. I asked what the fuck is wrong with you. He

(Continued)

White, Michael Williamson, and John Wilson. (Doc. 13, Exhibit 9.) At the hearing, Stanton testified, consistent with the charging document, that he gave Knighten a direct order to surrender the boots and that the inmate refused that direct order. (*Id*. at 2.) The face of the report reflects that Knighten's listed inmate witnesses did not provide much assistance and, indeed, reflects that the most action that one of the witnesses described is that upon entering the cell, the officers pushed plaintiff down on the bed and took the boots. (*Id*.) However, written questions posed to these inmates by Knighten also reflect that one of the inmates heard one of the officers say they were going to beat his (Knighten's) ass and several inmate witnesses saw the officers hitting Knighten and plaintiff offering no resistance. (*Id*. at 5 & 9; *see also* Doc. 13, Exhibit 10, at 6-8 & 11.)[18]

For his part, Knighten provided the following written statement:

---

says now Bitch we are going to beat your ass. And [he] start[ed] punching, kicking, and choking me until we end up with me facedown [o]n the floor getting punched and kicked in my back, hip and ribs. Then Stanton grabs my shirt collar and picks me up by it and is choking me with it all the way to the elevator[,] banging my head against the wall by the elevator then when the door opens still with his hand twisted in my collar choking me[,] shoves me in and bangs my head against the wall and is choking me the whole way to the infirmary and inside until we get to the exam room. And says this is not a democracy[,] it['s] a dictatorship and I run it.

(Doc. 13, Exhibit 2, at 6.)

[18] Knighten also posed written questions to Stanton. (*See* Doc. 13, Exhibit 10, at 4.) Knighten specifically asked Stanton when he (Knighten) could have struck the officer—after previously establishing by his questions that he was cuffed when the officers entered his cell—and Stanton somewhat curiously responded as follows: "DOING (sic) THE STRIP SEARCH PROCESS HE WAS UNCUFFED HE JUMPED UP OFF THE BED AND STRUCK ME. . . . ON MY RIGHT WRIST AS I BLOCKED THE PUNCH." (*Id*.) Stanton's answer to this question is even more curious in light of the contents of the Duty Officer Report completed by Sergeant Theresa Moore at approximately 12:41 a.m. on November 17, 2011. (*See* Doc. 13, Exhibit 9, at 10.)

On November 16, 2011, Correctional Sergeant Theresa Moore, Assistant Shift Commander, was supervising routine shakedowns in the Segregation Annex. At approximately 9:40 PM, Correctional Officers Charles Daughtry, Ernest Stanton and Anthony Gipson and Charles Andrews approached Cell #L-21 to search inmate Jamie Knighten (W/183509X). CO Stanton handcuffed Knighten to the

(Continued)

On Nov. 16th after showers Officers Stanton, Andrews, Daughtry and Gibson came to my cell[,] opened the tray door[,] and Stanton told me to cuff up. I asked him why he said because I motherfucking said so. So I turned around[,] put my hands out the door[,] and was cuffed. Then they opened the cell door [and] Stanton says now bitch you can give up those boots or else. I asked him what are they going to give me to wear. I have a boot profile and I don't even have any shower slides. I'm diabetic and I've got to have something to wear. To witch (sic) he said that['s] not my motherfucking problem[,] then he punches me in the face[, ] grabs me by the throat[,] and pushes me back onto the bed choking me while Officer Daughtry takes the boots off me. The Stanton tells me now Bitch we are going to beat your ass. And that[']s what they did. They choked[,] punched and kicked me. This was completely unnecessary[.] I never refused to comply or surrender anything, or strike anyone.

(*Id.* at 4.)

---

rear and CO Stanton, CO Andrews, CO Gipson and CO Daughtry and CS Moore entered the cell. CS Moore observed that inmate Knighten was wearing a pair of leather boots, black in color. CS Moore advised inmate Knighten to remove the boots as they were not authorized footwear. Inmate Knighten refused and submitted a profile to CS Moore. CS Moore observed the profile was out of date and appeared to be altered. CS Moore contacted Tammy Vazcy[,] Corizon's Medical Services Registered Nurse. Nurse Vaczy advised CS Moore that inmate Knighten had a profile for diabetic footwear only. CS Moore advised CO Stanton to confiscate the boots. CO Stanton twice ordered inmate Knighten to remove the boots and inmate Knighten failed to comply. CO Stanton ordered inmate Knighten to sit on inmate Knighten's bunk. Inmate Knighten failed to comply and CO Gipson and CO Stanton placed inmate Knighten on the bunk. CO Stanton stabilized inmate Knighten on the bunk as CO Daughtry and CO Gipson removed the boots. Inmate Knighten kicked CO Daughtry's right wrist as CO Daughtry was removing inmate Knighten's left boot. As the boots were removed, *inmate Knighten slipped the handcuffs and attempted to strike CO Stanton and CO Stanton used his (CO Stanton's) right arm to block the punch and was struck on the right wrist*. CO Andrews [and] Gipson and CS Moore removed inmate Knighten from the cell and escorted inmate Knighten to the Health Care Unit (HCU) for medical assessment.

(*Id.* (emphasis supplied).) Of course, both Stanton's answers to Knighten's questions and Moore's report are even more curious still because there has been no indication in this Court that the incident arose in conjunction with the performance of shakedowns in the segregations unit; instead, the defendants have at no time challenged plaintiff's contention that the issue regarding his boots arose after Officer Andrews saw him returning to his cell from the showers wearing the boots. In addition, there has been no mention made of a Nurse Vaczy in this Court, only a Nurse Dixon.

Hearing Officer Kenneth Tyus determined that Knighten violated rule 56 set forth in Administrative Regulation 403 by failing to obey a direct order from Officer Stanton to surrender his boots. (Doc. 13, Exhibit 9, at 3.) Tyus' recommended punishment was "20 Days Disciplinary Segregation[.]" (*Id.*)[19]

## CONCLUSIONS OF LAW

**A.** **Summary Judgment Standard**.  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) ("[S]ummary judgment is appropriate even if '*some* alleged factual dispute' between the parties remains, so long as there is 'no *genuine* issue of *material* fact.'").

The party seeking summary judgment has the initial responsibility of informing the court of the basis for the motion and of establishing, based upon the discovery instruments outlined in Rule 56(c), that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*,

---

[19]     In answer to plaintiff's complaint, Warden III Tony Patterson supplied an affidavit which reads, in relevant part, as follows: "W.C. Holman [C]orrectional Facility is sufficiently staffed and does at all times provide a safe and secure environment for all of it (sic) inmates. The Correctional staff is all properly trained and capable of performing their duties of supervising inmates and providing security requirements of the facility. All correctional officers are supervised by Sergeants, [L]ieutenants, and Captains who are thoroughly capable of supervising, monitoring the staff, and assisting in providing the best security and supervision possible. At no time has inmate Knighten's 8th and 14th amendment[ rights] been violated nor has inmate Knighten been subjected to any [c]ruel and unusual punishment." (Doc. 13, Exhibit 8, Affidavit of Tony Patterson, at 1-2.)

477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Allen v. Board of Public Educ. for Bibb County*, 495 F.3d 1306, 1313 (11th Cir. 2007) ("The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."). Once this initial demonstration is made, the "responsibility then devolves upon the non-movant to show the existence of a genuine issue . . . [of] material fact." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993); *see also Allen*, supra, at 1314 ("'When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and show by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing that there is a genuine issue for trial.'"); *see Comer v. City of Palm Bay, Florida*, 265 F.3d 1186, 1192 (11th Cir. 2001) ("Once the moving party discharges its initial burden of showing that there is an absence of evidence to support the non-moving party's case, the non-moving party must specify facts proving the existence of a genuine issue of material fact for trial confirmed by affidavits, '"depositions, answers to interrogatories, and admissions on file."'").

> Forbidding reliance upon pleadings precludes a party from "choos[ing] to wait until trial to develop claims or defenses relevant to the summary judgment motion." . . . This effectuates the purpose of summary judgment which "'is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" . . . Thus, "mere general allegations which do not reveal detailed and precise facts" will not prevent the award of summary judgment upon a court's determination that no genuine issue for trial exists.

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir.), *cert. denied sub nom. Jones v. Resolution Trust Corp.*, 516 U.S. 817, 116 S.Ct. 74, 133 L.Ed.2d 33 (1995); *see also LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998) ("[The nonmoving party] must raise 'significant probative evidence' that would be sufficient for a jury to find for that party."). In other words, there is no genuine issue for trial "[w]here the

record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see Comer, supra,* 265 F.3d at 1192 ("Summary judgment is required where the non-moving party's response to a motion is merely 'a repetition of his conclusional allegations' and is unsupported by evidence showing an issue for trial.").

In considering whether the defendants are entitled to summary judgment in this case, the Court has viewed the facts in the light most favorable to the plaintiff. *Comer, supra,* 265 F.3d at 1192 ("We view the evidence and all factual inferences raised by it in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-moving party.").

> The requirement to view the facts in the nonmoving party's favor extends only to "genuine" disputes over material facts. A genuine dispute requires more than "some metaphysical doubt as to the material facts." A "mere scintilla" of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment.

*Garczynski, supra,* 573 F.3d at 1165 (internal citations omitted). In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp., supra,* 43 F.3d at 599.

**B.**     **The Defense of Qualified Immunity and Plaintiff's Claims of Excessive Force and Failure to Intervene**.[20] All named defendants argue that they are entitled to

---

[20]     To the extent Knighten seeks to obtain money from any of the defendants in their official capacities, the defendants are entitled to absolute immunity. *Johnson v. Deloach*, 692 F.Supp.2d 1316, 1325 (M.D. Ala. 2010) ("'Alabama state officials are immune from claims brought against them in their official capacities.' . . . [I]t is clear to the court that the defendants [including Draper's warden, James Deloach,] are state officials entitled to sovereign immunity under the Eleventh Amendment for all claims seeking monetary damages from them in their (Continued)

qualified immunity as it relates to plaintiff's claims of excessive force and failure to intervene.[21] It is clear in the Eleventh Circuit, however, that the defense of qualified immunity "is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution by the Supreme Court decisions in *Hudson* and *Whitley*." *Skrtich v. Thornton,* 280 F.3d 1295, 1301 (11th Cir. 2002) (citation omitted). "Moreover, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held personally liable for his nonfeasance." *Id.* (citations omitted). As explained by the Eleventh Circuit, "[t]here is simply no room for a qualified immunity defense when the plaintiff alleges such a violation." *Id.*[22] Accordingly, in answering the questions of whether the facts alleged/established by Knighten make out violations of his Eighth

---

official capacities. . . . Thus, the defendants are entitled to absolute immunity from any claims for monetary relief presented against them in their official capacities.").

[21]     In *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738 (citations omitted); *see also Ashcroft v. al-Kidd,* ___ U.S. ___, ___, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011) ("Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."). In other words, a Court's inquiry into qualified immunity involves two prongs: "First, a plaintiff must show that a constitutional or statutory right has been violated. Second, a plaintiff must show that the right violated was clearly established." *Fennell v. Gilstrap,* 559 F.3d 1212, 1216 (11th Cir. 2009) (citation omitted).

[22]     "We created this rule because, for an excessive-force violation of the Eighth . . . Amendment[], 'the subjective element required to establish it is so extreme that every conceivable set of circumstances in which this constitutional violation occurs is clearly established to be a violation of the Constitution . . . .'" *Fennell, supra,* 559 F.3d at 1217, quoting *Johnson v. Breeden,* 280 F.3d 1308, 1321-1322 (11th Cir. 2002) (other citation omitted).

Amendment rights, the undersigned looks at the force utilized by Officers Stanton and Daughtry.

1. **Excessive Force—Stanton and Daughtry**.

The Eighth Amendment's prohibition against cruel and unusual punishment, U.S. Const. amend. VIII, governs the use of force by prison officials against convicted inmates. *Campbell v. Sikes,* 169 F.3d 1353, 1374 (11th Cir. 1999); *see also Johnson v. Moody,* 206 Fed.Appx. 880, 883 (11th Cir. Oct. 31, 2006).[23] In order to establish an Eighth Amendment excessive force claim against defendants Stanton and Daughtry, plaintiff must prove both an objective and subjective component. That is, plaintiff must show that the alleged wrongdoing was objectively "'harmful enough'" to establish a constitutional violation and that Stanton and Daughtry "'act[ed] with a sufficiently culpable state of mind,'" i.e., that the defendants acted "maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 & 8, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992) (citation omitted).

Subjectively, then, Knighten must establish that "force was applied . . . maliciously and sadistically to cause harm[,]" as opposed to being applied "in a good-faith effort to maintain or restore discipline[.]" *Hudson, supra,* 503 U.S. at 7, 112 S.Ct. at 999; *see also Whitley v. Albers,* 475 U.S. 312, 320-321, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986) ("[W]e think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'"). In making this determination, the Court considers the

---

[23]     "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir.R. 36-2.

need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived, any efforts made to temper the severity of a forceful response, and the extent of injury suffered. *Hudson*, 503 U.S. at 7, 112 S.Ct. at 999, *citing Whitley*, 475 U.S. at 321, 106 S.Ct. at 1085; *see also Campbell v. Sikes*, 169 F.3d 1353, 1375 (11th Cir. 1999) ("*Hudson* and *Whitley* outline five distinct factors relevant to ascertaining whether force was used 'maliciously and sadistically for the very purpose of causing harm': (1) 'the extent of injury'; (2) 'the need for application of force'; (3) 'the relationship between that need and the amount of force used'; (4) 'any efforts made to temper the severity of a forceful response'; and (5) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them.'").

On summary judgment, this Court must view the facts in the light most favorable to Knighten and, therefore, the undersigned summarizes the facts as presented by plaintiff. Knighten was returning to his cell in the segregation unit from the showers on November 16, 2011, when Officer Andrews approached and asked why he was wearing boots. Plaintiff first informed the officer that the boots were the only shoes he had because his shower slides had been misplaced upon his placement in segregation; however, upon being told by Andrews that the boots were against the rules and of the officer's "need" for the boots, Knighten told the correctional officer that he had a "boot" profile. A few minutes after Knighten arrived back at his assigned cell, Sgt. Moore looked at his profile, took it with her, and commented, "We'll see about that." Approximately five minutes later, four correctional officers—Stanton, Daughtry, Andrews, and Gipson—returned to Knighten's cell. Plaintiff was instructed to "cuff up" and though he initially verbally questioned the order, he quickly "turned around to the tray hole and got handcuffed behind" his back. Knighten's cell door was then rolled

and all four correctional officers entered his cell. As Knighten was trying to explain his need for the boots as a diabetic and the fact he had no other footwear, without warning Stanton hit Knighten in the face and grab him by the neck, all the while stating he "want[ed]' them motherfuckin' boots."[24] Daughtry grabbed plaintiff's legs and Stanton "slung" him onto the bed; the officers then proceeded to remove the boots from Knighten's feet, while Knighten begged the officers not to take the only shoes he possessed in segregation.[25] After successfully removing the boots, Stanton and Daughtry threw Knighten on the floor and began to kick and stomp him while Officers Gipson and Andrews stood by and watched the beating.[26] Knighten, who offered no resistance, was taken to the prison infirmary after the incident and though the "body chart" simply reflected "[s]uperficial scratches to [the] back [and a] scratch to [the left] elbow[,]" he was escorted to the prison infirmary numerous times on November 17, 2011; plaintiff complained of a lumbar spine injury, right ankle and foot pain, left shoulder pain, left hip pain, left ear pain, and an inability to hear out of the left ear. Examination on November 17, 2011 revealed swelling of the right lower back, right ankle, left eye and left inner ear and range of motion testing of the right ankle and left shoulder produced pain. A large bruise was noted on Knighten's left hip and "various" scratches were noted on the back of plaintiff's neck and on his face, lower right leg and low back. The nurse ordered x-rays and for Knighten to "lay in" to see the doctor.

---

[24]    Knighten was never given an opportunity to remove the boots and, indeed, the information presented by the defendants does not explain how plaintiff would have accomplished such an action since he was handcuffed to the rear.

[25]    The only reaction plaintiff received to such begging was another fist to the face from Stanton and Stanton's comment, "'[T]hat ain't shit compared to what you fixin to get.'"

[26]    Knighten was never aggressive towards the correctional officers.

Knighten was "wheeled into HCU" to see the doctor, "doubled over [with] pain, nausea, [and] c/o dizziness." At 2:00 p.m. on November 17, 2011, Knighten was administered Toradol and Ultram. Knighten continued to complain about left ear pain and an inability to hear out of the ear on November 18 and 19, 2011 and an appointment was made by the nurse for Knighten to see Dr. Barber on November 28, 2011.[27] On November 28, 2011, Dr. Barber's physical examination of Knighten's left ear revealed erythematous in the external canal and some dried blood. Although Dr. Barber's clinical notes refer the reader to her "orders" for her plan of treatment, her orders for that day are not contained in the medical evidence supplied this Court.

In this case, because Knighten's hands were cuffed behind his back—his "front cuff profile" having been rescinded a few days earlier—the undersigned fails to appreciate how plaintiff was expected to obey an order to remove his boots. Moreover, with cuffs on and four officers in his cell it is inexplicable that Stanton would have any need to "blindside" Knighten with a fist to the face and grab the inmate's throat, while Daughtry lifted his legs and the inmate was "slung" onto his bed. Indeed, under the facts presented by Knighten there could have been no threat reasonably perceived by the four officers. Finally, even if it was then somehow reasonable for the officers to use some degree of force to hold Knighten down on his bed to remove his shoes, there was certainly no justification for Stanton to again hit Knighten with a closed fist—while taunting him—and then for Stanton and Daughtry to throw Knighten down on the floor of his cell—after removal of the boots—to kick and stomp the still-handcuffed inmate— again cursing and taunting him—while Andrews and Gipson stood by and watched the

---

[27]     As well, on November 19, 2011, he was prescribed Motrin 800mgs twice daily for seven days.

continued assault. Certainly given the minimal need for force beyond that for four correctional officers to hold the handcuffed Knighten and remove his boots, the amount of force applied by Stanton initially in hitting Knighten in the face area and grabbing him by the throat and, later, by Stanton again hitting the inmate, and, later still, by Stanton and Daughtry in throwing Knighten on the floor and kicking and stomping him—all the while cursing and taunting him—was necessarily "inordinate compared to the need for force." *Smith v. Vavoulis,* 373 Fed.Appx. 965, 967 (11th Cir. Apr. 19, 2010) (unpublished).[28] To state what appears to the undersigned obvious, there were no efforts made by Stanton and Daughtry to temper the severity of the forceful response; instead, their actions toward the handcuffed inmate simply became more severe. Thus, the undersigned recommends that the Court find, on summary judgment, that Stanton and Daughtry applied force not in an effort "to maintain or restore discipline" but

---

[28] And while the nurse who completed a "body chart" on Knighten not long after the incident noted only superficial scratches to his back and left elbow, by the next day another examining nurse noted plaintiff's right low back, right ankle, left eye and left inner ear were swollen, pain was produced on range of motion testing of the right ankle and left shoulder, and scratches were found on Knighten's neck, face, right lower leg, and low back. Moreover, by the time plaintiff saw Dr. Barber on November 17, 2011, he had to be "wheeled in" because he was so doubled over with pain (nausea and dizziness); Barber administered Knighten both Ultram and Toradol. If the entirety of the medical evidence consisted of the body chart completed on November 16, 2011, the undersigned would be more inclined to agree with the defendants that Stanton and Daughtry did not act maliciously or sadistically; however, the additional and numerous objective findings the following day which resulted in the administration of narcotic-type medication—and recurring left ear treatment on November 28, 2011—tend to support Knighten's version of his treatment at the hands of Stanton and Daughtry and support a finding, on summary judgment, that force was applied by these two defendants maliciously and sadistically to cause harm. *Compare Hudson v. McMillian*, 503 U.S. at 7, 112 S.Ct. at 999 ("The absence of serious injury is [] relevant to the Eighth Amendment inquiry, but does not end it.") *with Connell v. Tate,* 2012 WL 252817, *12 (M.D. Fla. Jan. 25, 2012) ("In determining whether the amount of force used against an inmate was *de minimis*, a court may consider the extent of the injuries suffered by the inmate. Nevertheless, a court ultimately should decide an excessive force claim based on the nature of the force rather than the extent of the injury." (citations and quotation marks omitted)).

"maliciously and sadistically to cause harm." *Hudson, supra,* 503 U.S. at 7, 112 S.Ct. at 999; *see also Whitley, supra,* 475 U.S. at 320-321, 106 S.Ct. at 1085.[29]

Turning to the objective component, the undersigned notes that inherent in the protection afforded by the Eighth Amendment is the principle that "not 'every malevolent touch by a prison guard gives rise to a federal cause of action.'" *Clark v. Johnson*, 2000 WL 1568337, *12 (S.D.Ala. Oct. 11, 2000), quoting *Hudson*, 503 U.S. at 9, 112 S.Ct. at 1000. The objective component of an Eighth Amendment excessive force claim "necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort '"repugnant to the conscience of mankind."'" *Hudson,* 503 U.S. at 9-10, 112 S.Ct. at 1000 (citations omitted). While the Supreme Court in *Hudson* did not define "*de minimis* use of physical force," it did indicate that neither "serious" nor "significant" injury is required to satisfy the objective

---

[29]    In making this determination, the undersigned means to make no suggestion that Knighten's version of what happened in his segregation cell on September 16, 2011 is undisputed, only that such determination is proper—and would be proper by a reasonable trier of fact—in construing the facts in the light most favorable to the plaintiff. In other words, on summary judgment the undersigned does not find it undisputed that Knighten initiated the altercation by kicking Stanton and Daughtry as they tried to remove his boots given plaintiff's articulated position that he was never the aggressor. Moreover, it appears to the undersigned that Stanton's version of how he suffered an injury to his right wrist has changed over the course of time, the defendant testifying at plaintiff's December 5, 2011 disciplinary hearing that Knighten attempted to strike him and he blocked that blow with his right wrist (*see* Doc. 13, Exhibit 10, at 1-4) while he now swears in this Court that Knighten kicked him in the wrist (Doc. 36, Exhibit 3, Declaration of Ernest Stanton, at 2). Stated somewhat differently, because "the credibility of the allegations made by a plaintiff or [the] defendant[s] is beyond the scope of a trial court's ruling on a motion for summary judgment[,]" and Knighten has established/alleged "facts sufficient to survive a motion for summary judgment concerning his excessive force claim[]" asserted against Stanton and Daughtry, those defendants' "motion for summary judgment on the basis of qualified immunity is [] due to be denied." *Gladys v. Alabama Department of* Corrections, 2012 WL 3542203, *4 & *5 (N.D. Ala. Jul. 11, 2012), *report and recommendation adopted by,* 2012 WL 3542292 (N.D. Ala. Aug. 13, 2012); *see also Logan v. Smith,* 439 Fed.Appx. 798, 801 (11th Cir. Aug. 29, 2011) (unpublished) ("While the summary judgment motion presented a close call, the record evidence does not flatly contradict [plaintiff's] allegations and, therefore, his version of the events cannot be discounted—nor the defendants' version credited—at this point in the litigation.").

component of an Eighth Amendment claim, nor is any arbitrary quantum of injury an absolute requirement of an excessive force claim, apparently out of concerns that certain forms of torture are capable of inflicting extreme pain without leaving any mark or tangible injury. *See id.* at 9, 112 S.Ct. at 1000 ("Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury."). Thus, the Eleventh Circuit requires "that the plaintiff suffer more than a *de minimis* injury, while being mindful of the fact that a significant injury is not required to establish an Eighth Amendment violation[.]" *Smith, supra,* 373 Fed.Appx. at 966 (internal citation omitted), citing *Hudson,* 503 U.S. at 8-10, 112 S.Ct. at 999-1001. In so doing, the Eleventh Circuit stays true to *Hudson's* determination that "bruises, swelling, loosened teeth, and a cracked dental plate, are not *de minimis* for Eighth Amendment purposes." 503 U.S. at 10, 112 S.Ct. at 1000; *compare id. with Smith, supra,* 373 Fed.Appx. at 967 (burning caused by mace, bruises, bleeding from the mouth, a deep cut on the wrist and swelling, and "knots" on the head, all of which healed without medical treatment, found to be similar to the injuries described in *Hudson* and, therefore, not *de minimis*).

Here, the undersigned recommends that this Court find that the injuries suffered by Knighten (bruises, swelling of numerous parts of the body, production of pain on range of motion testing, and a temporary inability to hear out of the left ear) are similar to the ones described in *Hudson* and *Smith* and, therefore, are not *de minimis*. Moreover, that *de minimis* force was not used in this case is apparent not only based upon the injuries suffered by plaintiff but, as well, by plaintiff's evidence that Stanton made it impossible for him to comply with any order to take off his boots by handcuffing his hands behind his back and that Stanton and Daughtry thereafter applied much more force (twice punching him in the face and then throwing him to the ground in order to

stomp and kick him) than necessary under the circumstances (since plaintiff was handcuffed) to retrieve the alleged contraband. *Compare Wilkins v. Gaddy,* 559 U.S. 34, 37, 130 S.Ct. 1175, 1178-1179, 175 L.Ed.2d 995 (2010) ("Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.") *with Logan, supra,* 439 Fed.Appx. at 802 ("[W]e must keep in mind that the focus of the Eighth Amendment inquiry is on the nature of the force applied, rather than the extent of injury inflicted."); *Harris v. Whitehead,* 2007 WL 2300964, *8 (M.D. Ala. Aug. 8, 2007) ("As discussed above, Harris sustained minimal injuries, less severe than those sustained by the plaintiffs in *Hudson, Skrtich,* and *Harris v. Chapman.* But, Harris sustained those injuries when he was physically restrained by handcuffs. He was not resisting or threatening Whitehead or Spann. His injuries occurred for no legitimate, penological reason. Slamming a handcuffed prisoner into a door and filing cabinet and body slamming him onto the floor with no legitimate purpose other than to cause pain violates the Eighth Amendment even though the injuries, a few abrasions, are not significant. . . . Were this not the case, a correctional officer could beat a handcuffed prisoner at will, avoiding Eighth Amendment liability so long as no marks were left.") *and Smith v. Mensinger,* 293 F.3d 641, 649 (3d Cir. 2002) ("[D]e minimis injuries do not necessarily establish *de minimis force*[.]"); *see Gomez v. Chandler,* 163 F.3d 921, 924-925 (5th Cir. 1999) (cuts, scrapes and contusions to the face, head, and body from beating by three correctional officers were sufficient to support excessive force claim); *Huggins v. Johnson,* 2006 WL 3667254, *5 (N.D. Fla. Dec. 12, 2006) (repeated punching and kicking of inmate's face and head while he was handcuffed and lying on the ground—which

caused extreme swelling to the face, a black eye, a chipped tooth, an injury to the right knee, and various other abrasions—could constitute more that *de minimis* use of force).

In light of the foregoing, Stanton and Daughtry are not entitled to summary judgment on plaintiff's claim of excessive use of force.

2.     **Failure to Intervene—Andrews and Gipson**.  As for plaintiff's claim against defendants Andrews and Gipson for failing to intervene, the undersigned declines to recommend a grant summary judgment in favor of these defendants since plaintiff's claim of excessive force against Stanton and Daughtry survives summary judgment. *Compare, e.g., Connell, supra,* at *13 ("Since Plaintiff's claim of excessive force survives the Motion for Summary Judgment, his claim of failure to protect will also survive the Motion for Summary Judgment[.] . . . Although Defendant Esford claims he is entitled to qualified immunity because he did not witness the use of force, . . . he originally claimed that he witnessed the use of force. Plaintiff asserts that Esford witnessed the incident and failed to intervene when Plaintiff was being beaten by the officers, and Esford was in a position to intervene. The facts, as alleged, show that Defendant Esford violated a constitutional right, failing to intervene when Plaintiff was being beaten by correctional officers when Esford was in a position to intervene.") *with Johnson, supra,* 692 F.Supp.2d at 1328 ("Johnson contends defendant Boozer slapped him in the face, struck him on the head, threw him to the floor and choked him for no reason and while he posed no threat to Boozer. . . . Johnson maintains defendants Bradford and Golson 'just stood [there] and watched' without intervening to stop Boozer. . . . The defendants further argue neither Bradford nor Golson witnessed any use of excessive force against Johnson. Viewing the facts in the light most favorable to Johnson, as is required at this stage of the proceedings, the court concludes defendants Boozer, Bradford and Golson are not entitled to qualified immunity as the plaintiff has alleged

facts sufficient to survive their motion for summary judgment regarding the excessive force claim lodged against them. . . . A genuine issue of material fact likewise exists regarding whether Bradford and Golson witnessed the use of excessive force and failed to intervene."); *see Campbell v. Harvill,* 2012 WL 928607, *5 (M.D. Ga. Feb. 15, 2012) ("[I]t is established in the Eleventh Circuit that [an] 'officer has a duty to intervene when another officer uses excessive force.'"), *report and recommendation adopted,* 2012 WL 929614 (M.D. Ga. Mar. 19, 2012).[30] In other words, Knighten has specifically averred that Andrews and Gipson were in his cell during the incident made the basis of this lawsuit and since the facts, when viewed in the light most favorable to plaintiff, establish that Stanton and Daughtry used excessive force against plaintiff a genuine issue of material fact remains as to whether Andrews and Gipson can be held personally liable for their nonfeasance.[31] Accordingly, Andrews and Gipson are not entitled to summary judgment on plaintiff's failure to intervene claim.[32]

---

[30] *See Campbell, supra,* at *5 ("To be held liable for his nonfeasance, an officer (1) must have observed or had reason to know that excessive force would be or was being used, and (2) must have had both the opportunity and the means to prevent harm from occurring.").

[31] The Court will be in a much better position to judge the credibility of all witnesses (including that of defendants Stanton, Daughtry, Andrews, and Gipson) at any subsequent evidentiary hearing or trial to be held in this case. *See Gladys, supra,* at *4 ("It is well established that assessing the credibility of the allegations made by a plaintiff or defendant is beyond the scope of a trial court's ruling on a motion for summary judgment.").

[32] Knighten also contended in his amended complaint that the defendants—save for defendant Tony Patterson—conspired to assault him and then conspired to cover-up the assault (Doc. 19, at 7-8 & 11-14; *see* Doc. 1, at 5-6 & 10 (several references to "conspiracy")); however, he nowhere makes mention of such conspiracy claims in his comprehensive reply (*see* Doc. 44).

> A plaintiff may state a § 1983 claim for conspiracy to violate constitutional rights by showing a conspiracy existed that resulted in the actual denial of some underlying constitutional right. The plaintiff attempting to prove such a conspiracy must show that the parties reached an understanding to deny the plaintiff his [] rights. The conspiratorial acts must impinge upon the federal right; the plaintiff must prove an actionable wrong to support the conspiracy. A

(Continued)

**C.** **Defendants' Contention that Plaintiff's Case is Barred by the Prison Litigation Reform Act ("PLRA")**. In a separate section of their brief, the moving defendants, citing to § 1997e(e) of the PLRA, contend that Knighten's case is barred by the PLRA because he has failed to allege more than a *de minimis* injury. (*See* Doc. 13, at 18.) "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). The Eleventh Circuit has specifically held that "in order to satisfy the statute, 'the physical injury must be more than de minimis, but need not be significant.'" *Dixon v. Toole,* 225 Fed.Appx. 797, 799 (11th Cir. Apr. 4, 2007) (unpublished) (citation omitted).[33]

---

plaintiff claiming a § 1983 conspiracy must prove the defendants reached an understanding to violate the plaintiff's constitutional rights. Factual proof of the existence of a § 1983 conspiracy may be based on circumstantial evidence.

*Grider v. City of Auburn,* 618 F.3d 1240, 1260 (11th Cir. 2010) (internal citations and quotation marks omitted). Although "'[t]he plaintiff does not have to produce a "smoking gun" to establish the "understanding" or "willful participation" required to show a conspiracy,'" *Negron v. Bryant,* 2010 WL 746727, *6 (M.D. Fla. Mar. 3, 2010), citing *Bendiburg v. Dempsey,* 909 F.2d 463, 469 (11th Cir. 1990), he "'must show some evidence of agreement between the defendants.'" *Id.,* citing *Bailey v. Board of County Commissioners of Alachua County, Fla.,* 956 F.2d 1112, 1122 (11th Cir. 1992) ("The linchpin for conspiracy is agreement, which presupposes communication."). Indeed, "[f]or a conspiracy claim to survive a motion for summary judgment [a] mere scintilla of evidence . . . will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Id.* (quotation marks omitted).

In answer to his initial complaint, two of the named defendants, Correctional Officers Charles Andrews and Anthony Gipson, denied conspiring with others to violate Knighten's constitutional rights. (*See* Doc. 13, Exhibits 6 & 7.) And, indeed, the undersigned simply cannot find even a scintilla of evidence offered by Knighten (beyond rank speculation) pointing to agreements reached by the defendants to assault him and to cover-up the assault. *See Johnson v. Warden,* 491 Fed.Appx. 60, 62 (11th Cir. Sept. 27, 2012) (unpublished) ("[W]ith respect to his conspiracy claims, Johnson failed to present any non-conclusory and meaningful evidence that the prison officials reached an agreement to violate his constitutional rights."), *cert. denied sub nom. Johnson v. Giles,* ____ U.S. ____, 134 S.Ct. 290, 187 L.Ed.2d 209 (2013). Accordingly, the defendants are entitled to summary judgment as to plaintiff's conspiracy claims

[33] "The Eleventh Circuit has interpreted this provision of the PLRA to mean that if due to the defendant's actions, a prisoner has not suffered some physical injury which is
(Continued)

To the extent the undersigned's previous discussion has not sufficiently put this issue to rest, it is recommended that the Court find that plaintiff's claims for compensatory damages surmount § 1997e(e)'s bar inasmuch as he has put forth evidence of physical injuries that are greater than *de minimis* or, at the very least, has put forth evidence from which a jury could determine that his physical injuries are more than *de minimis*. *See Cotney v. Bowers,* 2006 WL 2772775, *6 & *7 (M.D. Ala. Sept. 26, 2006) ("[T]he Court rejects Bowers' argument that Cotney's excessive force claim is barred by the Prison Litigation Reform Act [] because he suffered only a *de minimis* injury. . . . Cotney testified that he suffered bruises on his ribs from Bowers' use of force and that the bruises healed after several weeks without treatment. The Court cannot find as a matter of law that Cotney's injury is *de minimis.* Although bruising which lasts for several weeks could be viewed as a *de minimis* injury, it could also be viewed as an injury that is greater than *de minimis.* The Court, however, need not make that determination as it is due to be made by a trier of fact. Because the evidence before the Court supports a reasonable inference that Cotney's injury is more than *de minimis,* the Court finds that Bowers is not entitled to summary judgment on Cotney's excessive force claim."). This evidence consists of the treatment records from the prison infirmary which reference treatment—including x-rays, being instructed to "lay in" to be evaluated by the doctor, administration of narcotic-type pain medication,[34] and nurses'

---

sufficient to satisfy the statutory provision in question, and the prisoner therefore cannot show anything more than mental or emotional suffering, the prisoner is foreclosed from obtaining compensatory or punitive damages even if there has been some violation of his constitutional rights." *Thomas v. Pieniozek,* 2011 WL 810696, *3 (S.D. Fla. Feb. 1, 2011), *report and recommendation adopted,* 2011 WL 777894 (S.D. Fla. Mar. 1, 2011).

[34]     Indeed, on November 17, 2011, at 2:00 p.m., plaintiff was given both Ultram and Toradol, narcotic-type medications.

instructions Motrin 800 mgs twice a day for 7 days beginning on November 19, 2011—for treatment of the noted obvious swelling to Knighten's right lower back, right ankle, left eye and left inner ear canal, a large bruise on the left hip, scratches over numerous portions of the body, and production of pain in the left shoulder and right ankle on range of motion testing. In addition, Dr. Barber provided subsequent treatment—on November 28, 2011—with respect to Knighten's left ear, following the inmate's continued complaints of pain and an inability to hear, although the incomplete medical records fail to reveal the exact nature of such treatment. Needless to say, based upon this evidence a jury could certainly determine that Knighten's injuries were more than trifling or minimal and award him damages for such injuries.[35] *Cf. Nix v. Carter,* 2013 WL 432566, *2 (M.D. Ga. Feb. 1, 2013) ("[H]ere, Plaintiff is also seeking damages for the *actual* physical injuries he received from the alleged excessive use of force. This Court can find no authority limiting a prisoner's damages for the *actual* physical injury he may have suffered, even if the court determines the injury was *de minimis.* Section 1997e(e)only bars recover[y] for mental or emotional injury, and the Eleventh Circuit has held that '[c]ompensatory damages under § 1983 may be awarded [] based on *actual injuries* caused by the defendant. This Court has already found a jury question exists as to whether Plaintiff suffered the actual injuries he claims. Thus, if the jury in this case determines that Defendant's use of force was unconstitutional, and Plaintiff suffered an actual physical injury, this Court can find no reason why the jury could not award compensatory damages for the *actual* physical injury Plaintiff suffered. If the jury finds Plaintiff has a compensable physical injury, then the jury is authorized to award

---

[35]     *See* BLACK'S LAW DICTIONARY, at 496 (9th ed. 2009) (defining *de minimis* as trifling, minimal, or "so insignificant that a court may overlook it in deciding an issue or case.").

punitive damages based on the compensable physical injury. Defendant also argues that if the Court finds Plaintiff's physical injuries were *de minimis,* he is barred from recovering nominal damages. . . . Although the Eleventh Circuit has not definitively decided on the availability of nominal damages under § 1997e(e) when Plaintiff suffers only a *de minimis* physical injury, . . . in an unpublished case, the Eleventh Circuit held that '[n]ominal damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages. Thus, a prayer for nominal damages is not precluded by § 1997e(e).' Moreover, this Court agrees with the vast majority of district courts in this Circuit that allow prisoners to recover nominal damages under the PLRA where the prisoner suffers from only a *de minimis* physical injury." (footnotes omitted)).

**D.** __Deliberate Indifference to a Serious Medical Need__.  The undersigned appreciates Knighten's argument in this regard to be that the defendants were deliberately indifferent to his serious diabetic condition by taking from him his boots and not providing him with appropriate substitute footwear.

To prevail upon a claim of deliberate indifference to a serious medical need, an inmate must "shoulder three burdens." *Goebert v. Lee County,* 510 F.3d 1312, 1326 (11th Cir. 2007).[36] First, he must establish the objective component by showing that he has a serious medical need. 510 F.3d at 1326 (citation omitted). Next, he must establish the subjective component "by showing that the prison official[s] acted with deliberate

---

[36]     *See Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (when seeking relief based on deliberate indifference of responsible officials, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts."), *cert. denied,* 531 U.S. 1077, 121 S.Ct. 774, 148 L.Ed.2d 673 (2001); *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (for liability to attach, the official must know of and then disregard an excessive risk to the prisoner).

indifference" to his serious medical need. *Id.* (citation omitted). And, finally, he "must show that the injury was caused by the defendant's wrongful conduct." *Id.* (citation omitted).

As recognized in *Goebert, supra,* "[a] medical need that is serious enough to satisfy the objective component 'is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" 510 F.3d at 1326 (citation omitted). There can be no question that plaintiff's diabetic condition is a serious medical need; however, there is nothing in the evidence presented to this Court that even begins to suggest that Knighten's diabetes was not treated on November 16-17, 2011, nor is there any evidence suggesting that the condition of plaintiff's feet deteriorated following the removal of his boots and failure of the defendants to provide him with replacement footwear, as to require medical attention. Indeed, there is no mention of plaintiff's feet in the medical records and Knighten's failure to comment about a lack of footwear to infirmary nurses and the infirmary doctor speaks volumes that the fact he was made to go barefoot did not result in a condition mandating treatment. Thus, the objective component of this claim is lacking. The third element is also missing because, again, there is no evidence of any injury caused to plaintiff by the action of the defendants in taking his boots and not giving his appropriate diabetic footwear.

The subjective component "requires a showing that a prison official acted with deliberate indifference to the prisoner's serious medical need." *Goebert,* 510 F.3d at 1326. Deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct.

1970, 128 L.Ed.2d 811 (1994); *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir.1998) (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference). In addition, a plaintiff must prove that the prison official disregarded the risk of serious harm by conduct that amounts to more than gross negligence. *Goebert, supra,* 510 F.3d at 1327 (citation omitted). This is because "deliberate indifference" entails more than mere negligence. *Townsend v. Jefferson County*, 601 F.3d 1152, 1158 (11th Cir. 2010).

At best, the defendants in this case were merely negligent in failing to replace Knighten's boots with appropriate diabetic footwear, particularly since, as aforesaid, this conduct did not lead to any injury to plaintiff requiring the need for medical treatment. Instead, what caused the need for treatment were the actions of two correctional officers in beating plaintiff, not the failure to give him appropriate substitute footwear following the removal of the boots.

**E.      Supervisory Liability—Sergeant Theresa Moore and Warden Tony Patterson**. The undersigned takes up this issue, specifically as to Sgt. Moore, inasmuch as plaintiff has specifically averred that Moore was not in his cell when he was assaulted by Stanton and Daughtry and his boots removed from his feet and confiscated. (*Compare* Doc. 1, at 4 & 8-10 *with* Doc. 19, Amended Complaint, at 10-13 *and* Doc. 44, Knighten declar., at 1 ("COs Stanton, Daughtry, Andrews and Gibson came to my cell and Sgt. Moore was not present.").) "Supervisory officials cannot be held liable under § 1983 for the unconstitutional actions of their subordinates based on respondeat superior liability. The standard by which a supervisor is held liable in his individual capacity for the actions of a subordinate is extremely rigorous. A claim based on supervisory liability must allege that the supervisor: (1) instituted a custom or policy

which resulted in a violation of the plaintiff's constitutional rights; (2) directed his subordinates to act unlawfully; or (3) failed to stop his subordinates from acting unlawfully when he knew they would." *Gross v. White*, 340 Fed.Appx. 527, 530-531 (11th Cir. Jul. 17, 2009) (unpublished) (internal citations and quotation marks omitted)); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) ("[S]upervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation. The necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. Alternatively, the causal connection may be established when a supervisor's custom or policy [] results in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so. The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." (internal citations, quotation marks, ellipses, and brackets omitted)). In other words, "'to establish supervisory liability under § 1983, a plaintiff must allege that the supervisor personally participated in the alleged unconstitutional conduct or that there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation.'" *Franklin v. Curry*, 738 F.3d 1246, 1249 (11th Cir. 2013) (citations omitted).

The record in this case is entirely devoid of any evidence that Knighten's alleged assault at the hands of several identified correctional officers—and the resultant taking

of his boots without provision for appropriate footwear—occurred due to the deliberate indifference of Patterson, or defendant Moore.[37] Indeed, as plaintiff points out in his comprehensive response in opposition he "dropped" Warden Patterson as a defendant in his amended complaint. (*Compare* Doc. 44, at 11 *with* Doc. 19 (no mention made of Patterson in the amended complaint).) Additionally, beyond the obvious concession that Moore did not personally participate in the excessive use of force (and confiscation of boots), plaintiff has presented no evidence whatsoever of an objectively substantial risk of harm at the time of the alleged incident nor is there any evidence demonstrating subjective awareness of a substantial risk of such harm by Moore.[38] Such a spur-of-the moment assault/attack of the kind that occurred in this case[39] certainly cannot rise to the level of an Eighth Amendment violation by a supervisory prison official.[40] Consequently, summary judgment is due to be granted in favor of defendants Moore and Patterson on the claims of deliberate indifference lodged against them by Knighten.

---

[37]    "Deliberate indifference requires the following: '(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence.'" *Franklin, supra,* 738 F.3d at 1250, quoting *Goodman v. Kimbrough*, 718 F.3d 1325, 1331-1332 (11th Cir. 2013).

[38]    Indeed, while Moore—as plaintiff suggests—sent the four correctional officers to Knighten's cell to retrieve the boots, there is absolutely no admissible evidence that Moore had any idea that in retrieving the boots Stanton and Daughtry would utilize excessive force repugnant to the Constitution.

[39]    In other words, Knighten has set forth only one incident in which he experienced physical violence at the hands of the correctional officers Sgt. Moore supervised. "A single incident fails to demonstrate a history of widespread abuse sufficient to notify [the supervisory defendant]." *Harris v. Whitehead,* 2007 WL 2300964, *10 (M.D. Ala. Aug. 8, 2007) (citations omitted).

[40]    In addition, plaintiff has not provided this Court with sufficient evidence to make out  prima facie conspiracy claims against the defendants.

## CONCLUSION

Based upon the foregoing, the moving defendants' motion for summary judgment is due to be **GRANTED IN PART** and **DENIED IN PART** as more specifically described hereinabove.

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(b); S.D.ALA. L.R. 72.4. The parties should note that under Eleventh Circuit precedent, "the failure to object limits the scope of [] appellate review to plain error review of the magistrate judge's *factual findings*." *Dupree v. Warden*, 715 F.3d 1295, 1300 (11th Cir. 2013) (emphasis in original). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the 21st day of February, 2014.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**